and Jack Jason Cole. We have for the appellant, Chris Cedilla, and for the appellate, Jeff Justice. Please proceed. May you please support, counsel? My name is Chris Cedilla and I'm here on behalf of Jack Jason Cole, the appellant. The facts of this case are somewhat disturbing, however, they do merit some discussion. On June 7th, Mr. Cole, suffering from a severe manic episode with psychotic features, killed his mother, Jane Cole. As set forth in our record and in our briefs, prior to June 7th, Mr. Cole received treatment at Heritage Behavioral Center Indicator, St. Mary's Indicator, and Danville Veterans Hospital for his psychiatric symptoms. Mr. Cole has had these symptoms since about 1999 and takes numerous medications to control them. On June 7th and the days leading up to June 7th, Mr. Cole was acting about as strange as he had ever acted, and that's according to his sister. He was recently released from jail on May 27th, about 10 days prior to the incident. In the intervening days, he didn't take his medication, he wasn't sleeping, he wasn't eating, and he hadn't used any alcohol or drugs. On June 7th, the day of the killing, Mr. Cole was hearing voices in his head, was talking gibberish, kept referring to missile codes, was insisting that he was a CIA agent repeatedly, he had claimed to be on a mission in Iraq and in Russia for the government, he was hallucinating about demons. In this delusional state, Mr. Cole killed his mother. Officers interviewing Mr. Cole thought him to be crazy as a loon. This opinion was substantiated by Mr. Cole's behavior and then later by Dr. Terry Killian's medical report. He interviewed Mr. Cole on August 27th and found that Mr. Cole, and I quote, at the time of the stabbing of his mother, was suffering from a severe manic episode of psychotic features and that as a result of these symptoms was incapable of appreciating the criminality of his alleged conduct. And that's the factual situation that gives rise to the legal issues that we're here today on. And the first legal issue is, does the Illinois Slayer Statute prohibit an insane beneficiary who caused the death of the decedent from inheriting from that decedent? This is an issue of first impression in Illinois. We're unable to find any case law on this. Illinois courts have, however, held that an insane beneficiary of an insurance policy can recover the proceeds of that policy when they're found to be insane and they cause the death of the policyholder. And that's in several Illinois cases. There's several out-of-state cases in courts in California, New Jersey, Florida, New York, that have found that pursuant to that state slayer statute, an insane person who causes the death of a policyholder can recover the proceeds of the insurance policy. Is there any case in Illinois following the amendment to the Slayer Statute? Not that I can find. The cases that you cited all happened before the statute had been amended? Your Honor, that would be correct, but they're all relating to insurance proceeds too. Great, but the Slayer Statute didn't reference insurance proceeds until later in time. Originally it didn't cover it at all. That would be correct, Your Honor. Well, the Illinois Slayer Statute requires that the killing be intentional and unjustified. In this instance, we're really not arguing about the unjustified. That's not an issue here. It's whether it was intentional or not. And our argument is that an insane person is incapable of forming the intent necessary to intentionally kill somebody. In the People Supreme Court case, they held that an insane person could commit no rational, voluntary act. He can do nothing intentionally. And for this reason, Mr. Cole's actions, he was insane at the time, and that's substantiated by all the witness accounts, the doctor's reports, and everything in the record. He was incapable of acting intentionally as required by the Slayer Statute. That's an interesting quote from a case. The only true definition of insanity that we have in Illinois, though, is one that has already been met in the criminal proceeding. That's correct. And the word intent is not used in the criminal statute. That's correct, Your Honor. Why then should we think that intentionally and unjustifiably means anything other than what it means if we look it up in the dictionary? I had the mental purpose to do what I did. And this actor knew that he was committing a violent act against a person that he knew to be his mother. Well, according to the record, Your Honor, he believed he saw the devil in his mother's eyes. He was hallucinating about demons. It's not clear that he... I thought it was voices as well. He was hearing voices as well, yes. I think specifically it was a voice called Charlie that was directing him what to do. But he was hallucinating about demons. It's not clear that he knew what he was doing. No, I knew what he was doing in the sense of whether or not he's guilty, criminally culpable for his conduct is different than whether he knew that he was taking an act of violence against another living being, whether mother or who. Well, and... And that process was interfered with by his mental illness, but it was an act that he took with thought. And what our position is, is that intentionally, as it's required by the statute, he just couldn't act intentionally because he wasn't sane. He couldn't make that next step where he intentionally killed his mother. He was not acting rationally. He couldn't intentionally do it. I don't know that that's answering your question, but that would be our position. Well, when he got up that day, he put on his clothes. He wasn't naked when he committed the crime, as far as we know. Thus, he intentionally clothed himself in the garb of an ordinary person. And I don't know what the evidence was, but he ate that day. He chose not to take his medication because his medication makes him... he doesn't like the way it makes him feel. And I'm adding fat. I don't know that he said that, but very often people who are mentally ill will say that. He made various choices. Whether those were rational, they were nonetheless the product of choice and I'm doing what I'm doing. I thought that person was my enemy because I saw the devil in their eyes. So, I took up arms against them and struck them down. That's a choice and choice implies I am doing what I'm volitionally doing. What I have decided to do, even though my decision making process is so skewed and so inherently culpable, nonetheless I'm doing it intentionally. Of course, I guess I'm making the other side's argument, but I'm really thinking out loud about what the statute means and what it was intended to mean. And Your Honor, those thoughts have all crossed my mind in preparing for this argument and the statute requires an intentional killing of another person. And I understand your reasoning of he intentionally may have picked up the knife, but in this instance, Mr. Cole, he was suffering from a skew of mental problems. I mean, he was... I don't think that he can And actually, some of the out-of-state case law that actually interpret that state's Slayer statute repeatedly find that insane persons are not capable of acting intentionally or unlawfully. And that's kind of the gist of the case law from the other states. You know, there's the estate of Latin, these are all cited in the brief, but that's the holding in these other states that an insane person, for the purposes of the Slayer statute, can't act case interpreting this statute yet. And based upon the other case law and just the fact that some case law in Illinois does suggest that, you know, as to insurance policies, an insane beneficiary who caused the death of another can recover the proceeds. And as to just the fact that an insane person's not acting rationally and can't make an intentional decision, and I understand there's a distinction between the criminal definition of insanity in here, but when interpreting this into the Slayer statute, this should all be taken into account in that in Illinois, an insane person should not be prohibited from inheriting pursuant to the Slayer statute if they were insane at the time of the killing. Counsel, what was the significance then of the amendment in 1983, which eliminated the requirement that there be a conviction for the death? The significance was to change the standard to intentional and unjustified, therefore not requiring a criminal conviction. We're not arguing that a criminal conviction is necessary to have that Slayer statute apply. We're just arguing that the killing would have to be intentional and unjustified, and that for our purposes, Mr. Cole couldn't have acted intentionally. And I don't know if that's answering your question or not. But you're wanting to use the criminal law as a backdrop by talking about intention. Yeah. And yet the definition of insanity, which only exists because of the criminal law. I mean, it doesn't come out of the medical lexicon except for the fact that the common law system wanted some understanding of why people act differently than one would expect them to act. And so now we statutorily have created, and the statute says nothing about intent. It's about appreciating the criminality of your conduct or your ability or inability to conform your conduct to the requirements of law. And that's correct in the criminal sense. And what we're trying to use that for is to interpret what the Slayer statute means by intentional. And by melding those two things together, our but deemed not to be able to act with rational thought and intent. But where is the jury instruction that says, if you can't act with rational thought and intent, then you're not guilty by reason of insanity. That isn't what it says. And I guess we're not in a criminal setting here. We're trying to interpret this under the Slayer statute, and we're trying to figure out what intentional means in the Slayer statute. There's no real case law on that in Illinois. And what we are trying to do is see what's out there. And what we've found is that other states, and even Illinois cases, have not prohibited an insane person who kills another from inheriting from that decedent. And that's our argument. We think that that is the law in other states, and that should be the law in Illinois. And the Slayer statute is fairly silent to it. They don't define intentionally or anything like that. So our position would remain that Mr. Cole, he's been deemed criminally insane, but outside of that, he couldn't have acted intentionally under the Slayer statute. But he also, he wasn't negligent. And he wasn't reckless. Does he have no state of mind at all? I wouldn't be able to answer that question right now. But the act that one takes has to either be, in law, that's why we're here. So you either act as a reasonable person, or you act negligently, or you act recklessly. Or you act as an insane person without understanding the criminality of your conduct. But it isn't that you act without all intent. And the Slayer statute in Illinois requires intentionally cause the death of another. We're saying that Jack, Mr. Cole, could not have intentionally caused the death of another. He wasn't capable of forming that mental state, and I understand that we're on different pages here, but he couldn't have intentionally caused the death of his mother. So when the legislature amended the statute, they just wanted to get rid of conviction and broaden the scope of who couldn't take, by whatever means. That would be my position, that they didn't want to make the bar to be a criminal conviction. They wanted to be able to cover where there wasn't a criminal conviction, but there was an intentional and unjustified slaying. And that would be my understanding, or at least my interpretation. So a reckless homicide would be, it wouldn't be intentional, but it would be unjustified. So we'd be arguing about, we wouldn't be arguing about it, because it would be probably pretty clear that it was unjustified. We wouldn't be talking about intent. And in war, if we had another civil war, and you shot your brother or your relative, it would be intentional, but it would be justifiable. And I mean, I think what's instructive here is there's not a lot of Illinois case law, and there is a lot of case law out of state, and a lot of those were cases of first impression as well. And they were interpreting the same standard of intentional and unjustified. And they have found that an insane person could not act intentionally. And the case that the Pelley cites, the Kissinger case, they had a different standard of willful and unlawful, and we believe that may be the reason for the different outcome in that case. I'm going to move on to the wrongful death, unless there's any questions on, more questions on the Slayer Statute. Our argument on this count is, at the trial court, we believe insanity should have been considered as a defense to the Wrongful Death Act claim. There is case law in Illinois on this. In 1887, in the McIntyre Court, and then again in the Roberts Court in the Fourth District, these decisions, the Roberts decision came out of the McIntyre decision. They set forth the premise that there's nothing wrong or unjust in a verdict that merely gives compensation for the actual result resulting from an injury inflicted by a lunatic. Both of these cases relied on public policy grounds, essentially saying that we can't have insanity as a defense, because that's going to provide a really strong temptation for anybody who, well I was insane, I don't want to be financially liable for the harm here. And I think the record in this case clearly shows that that temptation is not at play. Mr. Cole is a sick individual, he's been receiving treatment since 1999 on and off, and he's currently receiving more treatment at McFarland. There's a more recent case, and this is a First District case, Vosnos, and that held that insanity is not a complete defense to wrongful death. And this case kind of muddies the waters, because that leaves open the suggestion that insanity is some type of defense to wrongful death. And what we would be asking this Court to do would be to clarify that ruling and set forth what type of defense, if any, that wrongful death is, or that insanity is to a wrongful death action. And what this would mean in the end is that we'd be asking for a limited exception to the McIntyre and Roberts holdings that, you know, there is no question as to someone's mental state. This isn't someone trying to simulate insanity to, you know, get out of being punished. This is someone who is obviously insane. Everybody, all the doctors, all the witnesses, there's no doubt that in that case, insanity should be some type of defense to a wrongful death action. And moving on to the next prong of this argument would be that the trial court abused its discretion. If the award would stand for the wrongful death, the trial court abused its discretion in the amount of the award. There's very, very little evidence at trial supporting a $200,000 award. And not to minimize anyone's loss, this is a terrible situation, but Mr. Cole was an individual probably most greatly harmed by his mother's death. He saw her on a daily basis. He lived with her. She took him to treatment. She was there on a daily basis basically handling his affairs. For that reason, we think $200,000 is outside fair and reasonable compensation and would ask this court either reverse that award or apportion that award in part to Jack. And if there's no questions, that would be all I would have. Thank you, counsel. Thank you. Mr. Justice? When I filed this case, I knew it was going to be difficult. So I went to Judge Weber and I said, Judge, don't just give me some young lawyer off the GAL list. I want a lawyer, experienced criminal lawyer who's a GAL. And he appointed Tom Griffith, who's a 25-year lawyer who handled this at the trial level. He is one of the partners in the firm that Mr. Sedula works in. Because I knew that he had to go talk to a person who has been found criminally insane. Dealing with a client like that is very difficult. We got done, or he talked to Mr. Cole, and then we went and had a pretrial with Judge Weber. And at that pretrial, we kind of discussed the case, and Judge Weber gave us an indication of what he thought about the case so that we streamlined how we presented this case. And you will see we did something sort of unusual at a civil trial. We put a police detective on who summarized the entire police investigation. Hearsay like crazy. And that was by agreement because the facts of the case are not in dispute. It's the law. But one of the things that happened in the pretrial with Judge Weber was he said, You know, this is a difficult area. It's new. And we have someone who's mentally ill. I'm telling you before the trial that regardless of the outcome, I'm going to order the GAL to appeal because I want some finality to this. And so Mr. Steele was in an awkward situation in that he's been told he has to do this appeal. Justice Connect focused on the issue, and the problem is they want to use the criminal law when it helps them. And that is, okay, we got away from going to prison for the rest of our life or killing our mother by insanity, but we don't want to use the criminal definition of intent or the common definition of intent, which is that you act with volition. And this is not a situation, and you can see from the transcript, I called Mr. Kohler's witness, and I said, What's your name? And the second question I asked him was, How did you kill your mother? And he just opened up, and he told us. And this guy, Charlie, made me do it and challenged me in sort of a vulgar way to finish the job. And then I said, You knew when you were killing this person and fulfilling, quote, your mission, that you were killing someone. And he said, Yeah, I knew that. What if he had thought she was a tree and he took an ax to the tree? Because of his insanity, he saw her as a tree. Then he wins. You think he would under that? Absolutely, because the statute says, Don Johnson kills a person. So if he killed his daughter? No, I mean, but he kills his mother, but he's thinking it's a tree. Oh, I misunderstood your question. You have to intend that your act be to kill a person. So he had to know or have at least enough volition to know, I guess to use Justice Connick's argument, that he wasn't putting on a suit of armor, he was putting on his clothes in the morning when he got dressed. And that's the, there has to be, I mean, he knew, and this is interesting. If you look through the transcript, he was also, or the administrator, and I'm not sure if Mr. Cole did it himself, but the police officers also testified, that during this time that he was stabbing her and then going to his room, his sister, the administrator, was calling. And he was lying to her. He even said to her, Well, she's not here. She went out to McDonald's. She was sitting in the driveway in her car while she was calling. Right, well, there was something from the home as well, and that's what caused her to call the police. So he's deliberately misguiding his sister about his mother's whereabouts and his mother's welfare. Did Dr. Killian weigh in on this intentional behavior? He said in his report, there are four or five factors that weigh against my finding. He's a pretty objective guy. And he said it can be argued that these, and one of the things was the phone calls, the deliberate acts, the acts, I think he referred to as acts of deceit. And I think you'll find in the record Dr. Killian's report. I think we filed it as a mistake. We did. So, and you can see in there, and it's towards the end. So, while there is a desire to push the two definitions or muddle the definition of intent, it's hard to get beyond what the legislature intended. I think what the legislature intended was first to get rid of the requirement of a conviction, but also to expand it to other types of killing, as you've talked about, and to expand it beyond inheritance to contracts. And in particular, by the middle 80s, 1983, when the statute came into effect, the concept of 401ks and beneficiaries was finally growing. And this is really what we have in this case, is that the only thing that he could inherit was a $1,300 bond refund that his mom posted for Jack, or beaten her up a year ago, a year before where he was charged with aggravated battery. Everything else was by contract. And then those two, the two main two assets, the assets were split 50-50. So, if this had taken place before 1983, the contracts might have controlled, and Jack might have inherited, even though he knew he was killing his mother at the time. And so, that's why the legislature changed the statute, and why it's important for you to say, and I agree with Mr. Sebille in this sense, we all focused early on, including Judge Weber, on the concept of intention. Are we supposed to split and say, okay, if you killed the person and you were under LSD, and you thought you were killing a tree, does he get to inherit? Or, do we say, if there's any conscious volition on his part, you don't get to inherit? I found a case out of Washington, the Kissinger case that he cited, that split the hairs. He found some cases that say, we can split it, you know, the facts, split it the other way. I think that what has happened is the legislature, and what you need to remember is not only, this is not automatic.  It says the probate judge makes an independent determination as to whether it's intentional and unjustified. And so, the fact that he was found insane is sort of irrelevant. The judge makes his own decision as to whether or not this person knew he was putting his clothes on in the morning. And given the fact that Jack said he knew he was killing his mother when he killed her, I think for Judge Weber, it was the end of the question. With regard to the wrongful death damages. May I ask a question? Am I allowed to say no? My reading of Dr. Killian's report doesn't address whether Mr. Cole was capable of volitional thought at the time of the killings. And I may have missed it, but I don't find anywhere that the court has found that at the time he testified in this matter, that he was fit to testify. I realize there's no fitness finding in a civil matter. Is there any evidence that when he was testifying in this matter that he was not insane and capable of testifying, or at the time of the killings, whether he was capable of volitional thought? No to both. Because a doctor dealing with a question of insanity is not asked that question, as Justice Connick pointed out. So why would he put that in his report? Because it's irrelevant. And at the time he testified, he was incarcerated at, I'm not sure what the term is, he was staying at McFarland? Yes. And there's no testimony about his condition at that time? Medical testimony? No. Obviously Judge Weber had the opportunity to observe the witness, but I believe that Judge Weber's finding was that all of the evidence, which would include the testimony of Jack and his demeanor, said that this was intentional. I believe that is in his document. And do you understand how this case would be so much easier if we had Dr. Killian who testified to those two issues, whether he was capable of volitional thought at the time of the killing, and whether he was capable of testifying truthfully at the time of the probate matter? Yes. Truthfulness is not an element of competency. The question would be whether, if we're going to extrapolate from the criminal law, did he appear to understand the nature and purpose of the proceedings? I.e., did he know that he had some level of representation from the GAL? Did he understand the oath? And did he know that he was being asked questions, and that the answers to those questions would be used by the judge to decide something? And in this instance, it's an economic issue. Do you think the judge took those things into account? I do, and the reason I do is the reason I asked that I have a 25-year experience, and we were appointed as a GAL, which is a very uncommon situation. Mr. Griffith, I know, went and visited Mr. Cole before the hearing several times, and if Mr. Griffith had any questions about his fitness to testify, he would have seen some evidence. Because basically, I agreed in advance with Mr. Griffith that there is $200,000 worth of money here, a hundred of it, could be jacks, that can be used if we need to hire shrinks, because if you take Justice Myerkoff's approach, if I brought Killian in, and he'd said, yeah, he was clearly knowing that he put his clothes on and was acting maliciously, and Tom disagreed with that, he would have gone out and got the doctor from Champaign, I'll think of it here, he testifies a lot, he's the ARDC shrink. But anyway, another highly qualified doctor, and we would have ended up with a battle of the trees. But he didn't. And I've worked with Mr. Griffith on six death penalty cases. He knows what he's doing, and he would have made that decision if that had been an issue. And I told Mr. Griffith I was going to subpoena Jack because he had no Fifth Amendment rights, and I was going to ask him these questions. And he went over and talked to him, and basically I knew what Jack was going to say before he testified. We talked. So the issue may not be sort of outside the record and all that kind of stuff, but it gives you the flavor that maybe helps with the answer. Thanks. Thanks, counsel. Mr. Cuda. As to the Slayer statute itself, and understanding that there's an issue of, you know, is intent just volition, I think it's important to consider that the purpose of the Slayer statute is to make sure that someone doesn't go out and kill someone to financially benefit from it. And in this case, that's not an issue at all. Jack didn't know what he was doing criminally, and I would argue didn't know what he was doing in any context. He was hearing voices and just acting insane. There's no deterrent value here to prohibit an insane person from inheriting from the estate of someone whom they killed. So under the Slayer statute alone, there's just no public policy reason why an insane person cannot inherit. It's designed to protect, it's designed to discourage someone from going out and killing their mom or killing their dad or killing someone whom they're a beneficiary of. And in this case, that's not a concern here. And I would think in most cases where someone is insane and kills their mom or kills their dad and then inherits money, that that's not why they did it. That we're not protecting anybody by prohibiting an insane person from inheriting. You know, moving on to the out-of-state case law, I mean, I think the fact that Illinois doesn't have much on it, looking at the out-of-state case law, which is instructive, many states have found that an insane person cannot act intentionally for purposes of that given state Slayer statute. And I think that's an important consideration. I think that the Slayer statute in Illinois is not designed to prohibit an insane person from inheriting. And that would really be all I have to say about it, unless you guys have any questions. No, thank you, counsel. Thank you. We'll take this matter under advisement until recess.